IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 12-cv-00587-BNB-KMT

GALENA STREET FUND, L.P.,

Plaintiff,

v.

WELLS FARGO BANK, N.A.,

Defendant.

_____

## ORDER

_____

This matter arises on the defendant's **Motion to Dismiss** [Doc. #16, filed 04/20/2012]

(the "Motion").  The Motion is GRANTED IN PART and DENIED IN PART.

## I.  STANDARD OF REVIEW

In ruling on a motion to dismiss, the court must accept the plaintiff's well-pleaded

allegations as true and must construe all reasonable inferences in favor of the plaintiff.  City of

Los Angeles v. Preferred Communications, Inc., 476 U.S. 488, 493 (1986); Mitchell v. King, 537

F.2d 385, 386 (10th Cir. 1976).  The complaint must contain specific allegations sufficient to

establish that it plausibly supports a claim for relief.  Alvarado v. KOB-TV, L.L.C., 493 F.3d

1210, 1215 n.2 (10th Cir. 2007).  "The issue is not whether a plaintiff will ultimately prevail but

whether the claimant is entitled to offer evidence to support the claims."  Scheuer v. Rhodes, 416

U.S. 232, 236 (1974), overruled on other grounds by Davis v. Scherer, 468 U.S. 183 (1984).

## II.  BACKGROUND

The plaintiff, Galena Street Fund, L.P. ("Galena"), filed its Complaint on March 7, 2012.

The Complaint contains the following allegations:

1.  Galena is an investor in certain securitized trusts holding mortgage loans known as

residential mortgage-backed securities.  A residential mortgage-backed security is a form of

asset-backed security where cash-producing financial instruments, in this case mortgage notes,

are aggregated into pools and sold into trusts.  *Complaint*, ¶ 8.

2.  As an investor in residential mortgage-backed securities, Galena acquired the right to

a portion of the homeowners' mortgage payments and the proceeds from mortgage insurance

policies which are triggered when homeowners fail to make the payments.  The payments are

passed through a series of one or more servicers to the trustee, appointed to administer the trust,

and are then paid to the investors according to a predetermined formula.  Id. at ¶ 9.

3.  The trustee oversees the trust and the servicers.  The trustee also performs specific

duties set forth in pooling and servicing agreements.  Servicers manage the relationship with

homeowners; collect and remit payments; take action to minimize losses that occur when

homeowners stop paying their mortgages; and perform other duties set forth in servicing

agreements.  Id. at ¶ 11.

4.  This case involves two residential mortgage-backed securities issued by Countrywide

Home Loans, Inc. ("Countrywide") or its affiliates--i.e., Reperforming Loan REMIC Trust

Certificates, Series 2002-2 ("Series 2002-2 Security"), and Reperforming Loan REMIC Trust

Certificates, Series 2003-R1 ("Series 2003-R1 Security").  Id. at ¶ 13.  Countrywide acquired

some of the mortgage loans in the Series 2002-2 Security and all of the mortgage loans in the Series 2003-R1 Security from Washington Mutual Bank ("WaMu") through a Mortgage Loan Purchase and Sale Agreement ("Purchase and Sale Agreement").  Pursuant to the Purchase and Sale Agreement, all of the mortgage loans acquired from WaMu were insured by the Federal Housing Administration ("FHA") or guaranteed by the Department of Veterans' Affairs. ("VA") Id. at ¶ 14.

5.    WaMu retained the right t service the mortgage loans when it sold them to Countrywide.  Id. at ¶ 16.  WaMu and Countrywide entered into a Servicing Agreement regarding the loans.  Id. at ¶ 17.  The Servicing Agreement set forth specific obligations and restrictions including:

> a.  WaMu was obligated to collect all payments due under the mortgage loans, including taking actions to collect all payments not paid when due;
>
> b.  WaMu was prohibited, in the absence of consent, to take any action that would adversely affect WaMu's ability to collect payments under the FHA insurance or the VA guaranty;
>
> c.  WaMu was entitled to withhold funds to pay its servicing fees, instead of distributing those funds to the trust, only under specifically defined circumstances; and
>
> d.  WaMu was restricted from withholding funds from the trust to repay itself for servicing advances (payments to the trust in advance of the servicer's expected receipt of funds from the servicing of the loans) except as specifically provided for in the Servicing Agreement.

Id. at ¶¶ 17-19.

In addition, industry standards made applicable by the Servicing Agreement prohibited WaMu from making any servicing advances that it knew would be unrecoverable.  Id. at ¶ 20.

3

6.   On or about September 1, 2002, Countrywide entered into a Pooling and Servicing Agreement with a number of parties regarding the Series 2002-2 Security.  The Pooling and Servicing Agreement created a trust that included some of the mortgage loans that were part of the Purchase and Sale Agreement between WaMu and Countrywide.  It also contemplated that the beneficial interests in the trust fund would be sold in multiple classes of pass-through certificates.  Id. at ¶¶ 21-22.

7.   On or about October 15, 2002, Galena purchased 100% of the BB, B, and unrated classes of the Series 2002-2 Security.  Id. at ¶ 32.

8.   On or about February 1, 2003, Countrywide entered into a Pooling and Servicing Agreement with a number of parties regarding the Series 2003-R1 Security.  The Pooling and Servicing Agreement created a trust that was made up mortgage loans that were part of the Purchase and Sale Agreement between WaMu and Countrywide.   Id. at ¶¶ 23-24.

9.   On or about April 3, 2003, Galena purchased 100% of the BB, B, and unrated classes of the Series 2003-R1 Security.  Id. at ¶ 33.

10.   Under both Pooling and Servicing Agreements, Wells Fargo was appointed trustee of the trusts that held the mortgage loans.  Id. at ¶ 27.

11.   At the same time the Pooling and Servicing Agreements were executed, Countrywide, Wells Fargo Bank, N.A. ("Wells Fargo"), and WaMu entered into a Reconstituted Servicing Agreement for each trust.  Id. at ¶ 25.  In those agreements, Countrywide assigned its interests under the original Servicing Agreement to Wells Fargo as trustee.  WaMu agreed to continue to service the loans under the terms of the original Servicing Agreement subject to certain modifications in the Reconstituted Servicing Agreements.  Id. at ¶ 26.

12.   WaMu failed to service the loans and remit funds to the trusts in a manner consistent with the Servicing Agreement and industry standards. Id. at ¶ 44.  Specifically, if an underlying mortgage became delinquent, WaMu did not make proper claims to the FHA and VA, resulting in the rejection of claims that would otherwise have been paid. Id. at ¶ 45.  After failing to make proper claims to the FHA and VA, WaMu advanced to the designated trust the recoveries that would have been expected if the FHA and VA claims were properly made. Id. at ¶ 47.  WaMu continued to advance principal and interest beyond the receipt or after rejection of Part A and Part B insurance proceeds from the FHA or VA, despite the fact that it knew or should have known that the servicing advances would be unrecoverable. Id. at ¶ 49.  WaMu reimbursed itself from trust assets and then passed the losses on to the trusts. Id. at ¶ 38.  WaMu also made duplicate reimbursement claims against the trusts for the same advances. Id. at ¶ 54.

13.   These actions led to early and improper advances of principal to investors with senior interests in the securities. Id. at ¶ 51.  The cash available for distribution to Galena as a junior certificate holder was directly reduced by the amount of money improperly advanced to senior certificate holders. Id. at ¶ 55.  The balances of Galena's certificates were prematurely reduced to zero. Id. at ¶ 56.  Galena incurred millions of dollars in damages. Id. at ¶ 59.

14.   On or about July 17, 2006, Wells Fargo entered into a Servicing Rights Purchase and Sale Agreement with WaMu.  Wells Fargo was assigned "certain of WaMu's servicing rights" including the rights to service the loans that WaMu had previously serviced in the Series 2002-2 and Series 2003-R1 Securities. Id. at ¶¶ 60-61.[1]

---

[1]The Servicing Rights Purchase and Sale Agreement required WaMu and Wells Fargo to follow a Servicing Transition Schedule which began July 18, 2006, and ended February 16, 2007. *Brief*, Ex. F, § 2.05 and Ex. E (an exhibit to Ex. F).  As discussed below, I may consider

15.   After assuming WaMu's servicing duties, Wells Fargo continued to pass to the trusts losses from the same improper servicing advances and reimbursements.  Id. at ¶ 73.

16.   In late 2006, Galena, through its limited partner, "implored Wells Fargo to use its authority as trustee to prevent WaMu from improperly reimbursing itself and passing the losses onto the trusts."  Id. at ¶¶ 3, 69.  By that time, Wells Fargo had already entered into the Servicing Rights Purchase and Sale Agreement with WaMu and WaMu was passing unprecedented losses onto the trusts and, specifically, to Galena.  Id. at ¶ 70.  Wells Fargo did not take any action to prevent WaMu from reimbursing itself from the trusts' assets or passing the losses on to the trusts.  Id. at ¶ 71.  As a result, Wells Fargo acquired less of WaMu's servicing-related liability and debt than it otherwise would have.  Id. at ¶ 72.

17.   In December 2006, Galena, through its limited partner, informed Wells Fargo, in its capacity as trustee of the Series 2002-2 and Series 2003-R1 Securities, of Galena's belief that WaMu had violated the Servicing Agreement as described above and that Galena had suffered damages as a result.  Id. at ¶¶ 3, 74.  Wells Fargo responded that it needed to review WaMu's servicing records, but could not.  Id. at ¶ 75.

18.   On September 18, 2007, Wells Fargo filed suit against WaMu in the federal district court for the Central District of California seeking specific performance of WaMu's obligation to permit Wells Fargo to review the servicing records in accordance with the terms of the Servicing Agreement.  Id. at ¶ 78.  The suit was dismissed for lack of subject matter jurisdiction on January

---

the Servicing Rights Purchase and Sale Agreement in my analysis of Wells Fargo's Motion because Galena refers to the agreement in its Complaint, and it is central to the claim for breach of contract.  GFF Corp. v. Associated Wholesale Grocers, 130 F.3d 1381, 1384-1385 (10th Cir. 1997).

14, 2008.  Wells Fargo refiled the suit in Los Angeles Superior Court on January 24, 2008.  Id. at ¶ 79.  In its complaint, Wells Fargo admitted its duty to review the servicing files, stating that without court relief "Wells Fargo cannot fulfill its obligations to the Trust beneficiaries to review the servicing records of Washington Mutual relating to the mortgage loans owned by the Trust."  Id. at ¶ 80.

19.   On September 25, 2008, WaMu was seized by the FDIC and placed in receivership.  JPMorgan Chase Bank, N.A. ("Chase") entered into a "Whole Bank" Purchase and Assumption Agreement with the FDIC and WaMu whereby it assumed most liabilities of WaMu, but had 120 days to decide which WaMu contracts it would assume.  WaMu's holding company filed for bankruptcy shortly thereafter.  Id. at ¶ 81.

20.   On July 16, 2009, Wells Fargo added Chase as a defendant to its suit against WaMu.  Id. at ¶ 82.

21.   On June 17, 2010, WaMu's attorneys asserted that Chase had exercised its option in the Purchase and Assumption Agreement to reject the servicing agreements relating to the Series 2002-2 and Series 2003-R1 loans, and that Chase could not be liable on those agreements.  Id. at ¶ 84.  On June 17, 2010, Wells Fargo voluntarily dismissed Chase as a defendant.  Id. at ¶ 85.

22.   Wells Fargo obtained a default judgment for specific performance against WaMu.  Id. at ¶ 86.  Wells Fargo obtained from Chase 419 servicing files of the 23,934 mortgage loans at issue and provided them to Galena to review for servicing errors.  Id. at ¶ 90.  Galena's review revealed that WaMu passed on to the trusts excessive losses and, in some cases, duplicate losses.  Id. at ¶ 91.

23.   Certain files could not be produced because they were either lost or destroyed by Wells Fargo.  Id. at ¶ 92.  These files "are or were likely to contain additional evidence of Wells Fargo's liability."  Id. at ¶ 93.  Some or all of these files "were lost or destroyed after anticipation and/or commencement of litigation related to the matters set forth herein, of which Wells Fargo was a party or was aware."  Id. at ¶ 94.

Galena asserts five claims against Wells Fargo: (1) Breach of Fiduciary Duty; (2) Breach of Contract; (3) Breach of the Implied Duty of Good Faith and Fair Dealing; (4) Negligence; and (5) Unjust Enrichment.

## III.   ANALYSIS

### A.   Choice of Law

A federal court sitting in diversity, as here, must apply the choice of law provisions of the forum state where it resides.  Rocky Mountain Helicopters, Inc. v. Bell Helicopter Textron, Inc., 24 F.3d 125, 128 (10th Cir. 1994).  "Consistent with the Restatement (Second) of Conflict of Laws § 187 (1971) (Restatement)," Colorado courts "will apply the law chosen by the parties unless there is no reasonable basis for their choice or unless applying the chosen state's law would be contrary to the fundamental policy of the state whose law would otherwise govern." Target Corp. v. Prestige Maintenance USA, Ltd., -- P.3d --, 2013 WL 363324 at *2 (Colo.App. January 31, 2013) (citing Hansen v. GAB Bus. Services, Inc., 876 P.2d 112, 113 (Colo.App. 1994)); Wood Bros. Homes, Inc. v. Walker Adjustment Bureau, 601 P.2d 1369, 447 (Colo. 1979) (adopting the Restatement (Second) of Conflict of Laws for contract actions).

Both parties agree that under the terms of the servicing agreements and the Pooling and Servicing Agreements, New York law applies to the claims for breach of contract and breach of

the implied duty of good faith and fair dealing.  There is nothing in the record to show that it

would be unreasonable to apply the choice of law provisions or that they are contrary to

fundamental policies of the State of Colorado.  Therefore, I apply New York law to those claims.


The parties disagree on the law applicable to the claims for breach of fiduciary duty,

negligence, and unjust enrichment.  Wells Fargo asserts that Colorado law applies to these

claims because there is no contractual choice of law provision that addresses them, nor is there

any applicable exception to the general rule that the court should apply the law of the forum

state.  *Memorandum Brief in Support of Motion to* Dismiss (the "Brief"), p. 7.  Galena asserts

that the contractual choice of law provisions are broad enough to encompass all of its claims and,

therefore, New York law applies.  *Plaintiff's Response in Opposition to Motion to Dismiss* [Doc.

#21] (the "Response"), pp. 4-5.[2]

The Pooling and Servicing Agreements that created the trusts contain the following

provision:

> THIS AGREEMENT SHALL BE CONSTRUED IN
> ACCORDANCE WITH AND GOVERNED BY THE
> SUBSTANTIVE LAWS OF THE STATE OF NEW YORK
> APPLICABLE TO AGREEMENTS MADE AND TO BE
> PERFORMED IN THE STATE OF NEW YORK AND THE
> OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES
> HERETO AND THE CERTIFICATEHOLDERS SHALL BE
> DETERMINED IN ACCORDANCE WITH SUCH LAWS.

---

[2]Relying on <u>Susquehanna Inv. Group v. Amgen Boulder, Inc.</u>, 918 F.Supp. 326, 329
(D.Colo. 1996), Galena also asserts that "a motion to dismiss is not the proper forum for a choice
of law argument.  Rather, this issue is better addressed in a summary judgment motion."
*Response*, p. 5.  Galena's reliance on <u>Susquehanna</u> is misplaced.  The statement was directed to
the defendant in <u>Susquehanna</u> in the context of the case.  It was not stated as an absolute rule.

*Brief*, Ex. B, p. 141, § 10.03; Ex. C, p. 122, § 10.03.[3]

The Reconstituted Servicing Agreements that govern the servicing duties of the parties

contain the following choice of law provision:

> Governing Law.  This Agreement shall be construed in accordance
> with the laws of the State of New York and the obligations, rights
> and remedies of the parties hereunder shall be determined in
> accordance with the laws of the State of New York, except to the
> extent preempted by federal law.

Id. at Ex. D, p. 8, ¶ 9; Ex. E, p. 8, ¶ 9.[4]

These provisions state that New York law applies not only to construction of the

contracts, but to all rights and liabilities arising out of the agreements.  See Cagle v. The James

Street Group, 400 Fed.Appx. 348, 356 (10th Cir. 2010).  The claims for breach of contract and

breach of the implied duty of good faith and fair dealing arise directly from the agreements.

Tort claims such as breach of fiduciary duty and negligence do not arise out of a contract.

Id. at 357.  In resolving choice of law issues in tort actions, Colorado follows the "most

significant relationship" approach of the Restatement (Second) of Conflict of Laws.  First

National Bank v. Rostek, 514 P.2d 314, 448-49 (Colo. 1973).

---

[3]Citation is to the page numbers of the contracts, not the page numbers assigned by the court's docketing system.

[4]The other agreements at issue in this case also contain a New York choice of law provision.  The original Servicing Agreement states that "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to the conflicts of law provisions thereof."  *Brief*,  Ex. A, p. 35, § 9.5.  The Servicing Rights Purchase and Sale Agreement through which Wells Fargo acquired WaMu's servicing rights states that "[t]his Agreement shall be construed in accordance with federal law and the laws of the State of New York, without reference to the choice of law principles under the State of New York."  Id. at Ex. F, p. 38, § 7.09.

In applying that test, I must evaluate the following contacts: where the injury occurred; where the injury-causing conduct occurred; the residence, place of incorporation, and place of business of the parties; and where the parties' relationship is centered.  Restatement (Second) of Conflict of Laws § 145(2).  "These contacts are to be evaluated according to their relative importance with respect to the particular issue."  Id.

Section 145 requires that in making such an evaluation and in assigning a relative importance to each significant contact, the various factors listed in section 6 of the Restatement must be analyzed.  Restatement (Second) of Conflict of Laws § 145(2).  Those factors are:

> (a) the needs of the interstate and international systems,
>
> (b) the relevant policies of the forum,
>
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
>
> (d) the protection of justified expectations,
>
> (e) the basic policies underlying the particular field of law,
>
> (f) certainty, predictability and uniformity of result, and
>
> (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6(2).

"These policy considerations vary in importance and in application depending upon the field of law and the particular issue under consideration."  Sabell, 536 P.2d at 1164.  Protection of justified expectations, as well as predictability and uniformity of result, are not significant considerations when analyzing negligence claims because the parties "act without giving thought to the legal consequences of their conduct or the law that may be applied."  Restatement (Second) of Conflicts, § 6, comts. g and I.

"The claim of unjust enrichment is a judicially-created remedy designed to undo the benefit to one party that comes at the unfair detriment of another.  Unjust enrichment is based on principles commonly associated with restitution."  Lewis v. Lewis, 189 P.3d 1134, 1141 (Colo. 2008) (internal citation omitted).  Although there are no Colorado cases on point with regard to conflict of laws for an unjust enrichment claim, but recognizing the propensity of Colorado courts to rely on the Restatement (Second) of Conflicts, I look to the Restatement's provision on restitution claims.  Restatement (Second) of Conflict of Laws § 221, Comment on Scope, (stating that "[t]he rule of this Section applies to claims, which are based neither on contract nor on tort, to recover for unjust enrichment").  It states:

> (1)  In actions for restitution, the rights and liabilities of the parties with respect to the particular issue are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
>
> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
> (a) the place where a relationship between the parties was centered, provided that the receipt of enrichment was substantially related to the relationship,
>
> (b) the place where the benefit or enrichment was received,
>
> (c) the place where the act conferring the benefit or enrichment was done,
>
> (d) the domicile, residence, nationality, place of incorporation and place of business of the parties, and
>
> (e) the place where a physical thing, such as land or a chattel, which was substantially related to the enrichment, was situated at the time of the enrichment.

Galena alleges the following:

> [A] substantial part of the acts or omissions that form the basis of the cause of action occurred within [Colorado].  Specifically, Braddock, which, in addition to being Plaintiff's investment manager, is also a limited partner in Plaintiff and its attorney-in-fact, is based in and has its principal place of business in Colorado. Braddock caused Plaintiff to purchase the at-issue certificates and corresponded and otherwise engaged with Wells Fargo and Washington Mutual Bank, FA . . .  with respect to the acts and omissions alleged herein in Colorado.  Harm from the acts and omissions alleged herein was and continues to be suffered in Colorado.

*Complaint*, ¶ 7.

Galena's describes the parties as follows:

> 3.   Plaintiff Galena Street Fund, L.P. is a Cayman Islands exempted limited partnership.  The general partners in Plaintiff are Galena Street Series A, L.P. (Delaware; Galena Street Series C, L.P. (Delaware); and Galena Street Series B, Ltd (Cayman Islands).  The limited partner in Plaintiff is Braddock Financial Corporation (Delaware, with its principal place of business in Colorado).

> 4.   Defendant Wells Fargo is a federally-chartered national bank with its home office located at 101 N. Phillips Avenue, Sioux Falls, South Dakota 57104.  Wells Fargo is a citizen of South Dakota.

Id. at ¶¶ 3-4.

The record does not contain any information to show that New York has any relationship to the alleged breach of fiduciary duty; the alleged negligence; the alleged unjust enrichment; or the parties.  On the record now before me, it appears that Colorado has the most significant relationship to the transactions at issue and the parties involved in this case, and I find for purposes of the Motion that Colorado law governs the claims for breach of fiduciary duty, negligence, and unjust enrichment.

**B.  Breach of Contract**

The parties agree that to state a claim for breach of contract under New York law, a plaintiff must plead the following elements: (1) the existence of a contract, (2) the plaintiff's performance under the contract; (3) breach by the defendant, and (4) damages suffered as a result of the breach.  Elisa Dreier Reporting Corp. v. Global NAPs Networks, Inc., 84 A.D.3d 122, 127, 921 N.Y.S.2d 329, 333 (N.Y.A.D. 2 Dept. 2011) (citing JP Morgan Chase v. J. H. Elec. of New York, 69 A.D.3d 802, 803, 893 N.Y.S.2d 237, 239 (N.Y.A.D. 2 Dept. 2010)).[5]

In Claim Two, Galena alleges that (1) it became a party to the servicing agreements "and/or became an intended and/or foreseeable third party beneficiary" of the agreements "when it purchased the unrated, B-rated, and BB-rated interests in the Series 2002-2 and Series 2003-R1 Securities"; (2) it "fully performed its obligations when paid [sic] for its certificates in the Series 2002-2 and Series 2003-R1 Securities"; and (3) "Wells Fargo and/or WaMu" breached the agreements "by failing to properly administer insurance claims, improperly advancing sums to senior certificate holders in the Series 2002-2 and Series 2003-R1 trusts, [and] reimbursing itself for its improper servicing advances and then writing down the principal balances of the loans in the trusts' pools."  Complaint, ¶¶ 102-104.  The plaintiff further alleges that "Wells Fargo assumed or should be deemed to have assumed WaMu's liabilities under the Servicing Agreement, including the liability for WaMu's breaches described above, either in its contract

---

[5]Where there is no controlling authority from a state's highest court, decisions of a state's intermediate court "is datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." Webco Indus., Inc. v. Thermatool Corp., 278 F.3d 1120, 1132 (10th Cir. 2002) (internal quotation and citation omitted).

14

assuming such servicing, or as a matter of law and equity, because any failure to do so was in breach of Wells Fargo's fiduciary duties." Id. at ¶ 107.

Wells Fargo argues that Galena fails to state a claim for breach of contract because "[a]ll of the purported breaching acts . . . were servicing acts taken by WaMu, and not by Wells Fargo." *Brief*, p. 11. To the contrary, Galena alleges that after Wells Fargo assumed WaMu's servicing duties, it "continued to pass losses from the same improper servicing advances and reimbursements to the trusts." *Complaint*, ¶¶ 73, 104.

Galena alleges that Wells Fargo should be held responsible for WaMu's misconduct because Wells Fargo is a successor to WaMu. *Response*, p. 18, § C. Citing page 10, § 2.02 of the Servicing Rights Purchase and Sale Agreement, Wells Fargo asserts that although it acquired WaMu's servicing rights in 2006, it expressly did not assume any of WaMu's liabilities as a servicer and, therefore, Galena may not sue Wells Fargo for any of WaMu's actions. *Motion*, p. 11. Galena argues that the court should not consider the Servicing Rights Purchase and Sale Agreement because it cannot consider evidence or allegations outside the Complaint when deciding a motion to dismiss under Rule 12(b)(6), Fed.R.Civ.P. *Response*, pp. 18-19.

"[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss." GFF Corp. v. Associated Wholesale Grocers, 130 F.3d 1381, 1384-1385 (10th Cir. 1997). Galena refers to the Servicing Rights Purchase and Sale Agreement in its Complaint, and it is central to the claim for breach of contract. *Complaint*, ¶¶ 60, 73, 107. Moreover, Galena does not dispute the authenticity of the Servicing Rights Purchase and Sale Agreement. Therefore, I

have considered the Servicing Rights Purchase and Sale Agreement in my analysis of the defendant's Motion.

"The interpretation of an unambiguous contract and the determination whether a contract is ambiguous are issues of law to be determined by the courts." Currier, McCabe & Assoc., Inc. v. Maher, 75 A.D.3d 889, 890, 906 N.Y.S.2d 129, 131 (N.Y.A.D. 3 Dept. 2010) (citing W.W.W. Assoc. v. Giancontieri, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 (N.Y. 1990). "In making these determinations, the court should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of words should be sought." Id.

Section 2.02 of the Servicing Rights Purchase and Sale Agreement provides:

> Section 2.02. Assumption of Liabilities.
>
> Upon the terms and subject to the conditions of this Agreement, and subject to the Applicable Requirements (including without limitation the rights of the applicable Agencies and Investors), Purchaser shall, on the Sale Date, assume the contractual duties and obligations of Seller to be performed after the Sale Date (and prior to the Sale Date to the extent required by the applicable Investor to obtain the related Investor Consent, but subject to the repurchase and indemnification obligations of Seller set forth Article VI) with respect to any Servicing Rights and related assets described in Section 2.01, pursuant to the Servicing Agreements, *and any other liabilities as are expressly assumed by Purchaser under this Agreement, as may be limited in this Agreement*.

*Brief*, Ex. F, p. 10, § 2.02 (emphasis added).

Wells Fargo states that this provision specifies "that Wells Fargo assumed liability only for actions taken *after* the Sale Date of July 31, 2006." Id., p. 11, § B (emphasis in original).

16

However, the liabilities "expressly assumed" by Wells Fargo are not specified, nor are the liabilities "limited in" the Servicing Rights Purchase and Sale Agreement.  Because of the complexity of the language in Section 2.02 and the contract as a whole, and without the benefit of the development of the facts of the case, I am not prepared to say that Wells Fargo did not assume any liabilities for WaMu's actions taken before the sale date.[6]  Therefore, Galena may proceed on claims arising from (1) Wells Fargo's breaches of its contractual duties and obligations performed after the sale date, and (2) WaMu's liabilities expressly assumed by Wells Fargo under the Servicing Rights Purchase and Sale Agreement as may be limited by the Agreement.

Wells Fargo further argues that Galena lacks standing to bring a breach of contract claim based on the servicing agreements because it is neither a party to nor a third-party beneficiary of the agreements.  *Brief*, p. 12.  A plaintiff must be either a party to an agreement or a third party beneficiary of the agreement in order to have standing to bring an action for breach of the agreement.  Parker & Waichman v. Napoli, 29 A.D.3d 396, 398-99, 815 N.Y.S.2d 71, 74 (N.Y.A.D. 1 Dept. 2006).

Galena does not address Wells Fargo's argument that it is not a party to the agreements; it argues only that it is a third-party beneficiary.  Therefore, Galena's assertion that it is a party to the servicing agreements is deemed abandoned.  Poole v. Southwestern Bell Telephone L.P.,

---

[6]Wells Fargo has attached to its Brief six agreements (consisting of approximately 600 pages) that are applicable to this case.  Wells Fargo's references to the agreements are incomplete and conclusory.  A court is not obligated to search the agreements for provisions which support the defendant's arguments.  See Gross v. Burggraf Construction Co., 53 F.3d 1531, 1546 (10th Cir. 1995).  It is the litigants' responsibility to provide concise arguments, relevant facts, and specific citations to authorities and supporting evidence.  Toth v. Gates Rubber Co., 2000 WL 796068, *8 (10th Cir. 2000).

86 Fed.Appx. 372, 374 (10th Cir. 2003) (deeming claims abandoned in the district court because the plaintiff did not oppose defendant's argument to dismiss them in response to motion to dismiss).

"A party asserting rights as a third-party beneficiary must establish (1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost." State of California Public Employees' Retirement System v. Shearman, 741 N.E.2d 101, 104, 95 N.Y.2d 427, 434-35 (N.Y. 2000) (internal quotations omitted).  A third-party beneficiary "may recover under New York law only where the parties to the contract intend to confer a benefit upon him; he may not sue on a contract when the benefit is purely incidental to the performance of the contract."  Compagnie Nationale Air France v. Port of New York Authority, 427 F.2d 951, 954 (2d Cir. 1970) (citing Associated Flour Haulers & Warehousemen v. Hoffman, 26 N.E.2d 7, 10, 282 N.Y. 173, 180 (N.Y. 1940)).

Galena states that it is a third party beneficiary to the servicing agreements because it is a certificateholder and "in residential mortgage-backed securities transactions, servicing is performed for the express benefit of certificateholders." *Response*, pp. 15-16.  Galena cites Section 3.01 of the Pooling and Servicing Agreements, which provides that servicing of the loans is "[f]or and on behalf of the Certificateholders." *Brief*, Ex. B, p. 74, § 3.01; Ex. C, p. 55, § 3.01.[7]

---

[7]Galena refers to the Pooling and Servicing Agreements and the Reconstituted Servicing Agreements in its Complaint, and they are central to the claim for breach of contract.  *Complaint*, ¶¶ 21-27, 44 104.  Wells Fargo has attached these agreements to its Motion.  Galena does not

"One is an intended beneficiary if one's right to performance is appropriate to effectuate the intention of the parties' to the contract and . . . the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." RJ Capital, S.A. v. Lexington Capital Funding III, LTD, 2011 WL 3251554 at 12 n.11 (S.D.N.Y. July 28, 2011) (internal quotations omitted) (quoting Roosevelt Islanders for Responsible Southtown Development v. Roosevelt Island Operating Corp., 291 A.D.2d 40, 58, 735 N.Y.S.2d 83, 98 (N.Y.A.D. 1 Dept. 2001)).  In RJ Capital, the district court found that the parties to an indenture agreement had intended for the Noteholders to benefit from the promise because the Preliminary Statement of the Indenture provided that "[a]ll covenants and agreements made by the Co-Issuers herein are for the benefit and security of the Noteholders."  Id.  Similarly, Section 3.01 of the Pooling and Servicing Agreements demonstrates that Galena is an intended beneficiary of the agreements.

Wells Fargo argues (in two short sentences) that Galena cannot rely on provisions in the Pooling and Servicing Agreements because they apply to the "Master Servicer," not Wells Fargo, and the servicing agreements at issue do not contain the beneficiary language. *Brief*, p. 7. However, the Pooling and Servicing Agreements define "Master Servicer" as "Countywide Home Loans Servicing, L.P., a Texas limited partnership, and its successors and assigns, in its capacity as master servicer hereunder."  Id. at Ex. B, p. 43; Ex. C, p. 20.  Under the language of the Reconstituted Servicing Agreements and the Servicing Rights Purchasing and Sale Agreement, it appears that the servicing rights were ultimately assigned to Wells Fargo.  The

---

dispute the authenticity of the agreements.  Therefore, I have considered the agreements in my analysis of the Motion.  GFF Corp., 130 F.3d at 1384-1385.

Reconstituted Servicing Agreements and the Servicing Rights Purchasing and Sale Agreement do not appear to supercede the Pooling and Servicing Agreements (which contain the beneficiary language).  Based on the language in the agreements and the limited argument provided by Wells Fargo, I decline to disregard the beneficiary language of the Pooling and Servicing Agreements.

Wells Fargo also argues that Galena's failure to comply with section 10.08 of the Pooling and Servicing Agreements prevents Galena from bringing this action.  *Brief*, p. 13.  Section 10.08 provides in pertinent part:

> No Certificateholder shall have any right by virtue or by availing itself of any provisions of this Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Agreement, unless such Holder previously shall have given to the Trustee a written notice of an Event of Default and of the continuance thereof, as herein provided, and unless the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates shall also have made written request to the Trustee to institute such action, suit or proceeding in its own name as Trustee hereunder and shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses, and liabilities to be incurred therein or thereby, and the Trustee, for 60 days after its receipt of such notice, request and offer of indemnity shall have neglected or refused to institute any such action, suit or proceeding; it being understood and intended, and being expressly covenanted by each Certificateholder with every other Certificateholder and the Trustee, that no one or more Holders of Certificates shall have any right in any manner whatever by virtue or by availing itself or themselves of any provisions of this Agreement to affect, disturb or prejudice the rights of the Holders of any other of the Certificates, or to obtain or seek to obtain priority over or preference to any other such Holder or to enforce any right under this Agreement, except in the manner herein provided and for the common benefit of all Certificateholders.  For the protection and enforcement of the provisions of this Section 10.08, each and every Certificateholder and the Trustee shall be entitled to such relief as can be given either at law or in equity.

*Brief*, Ex.  B, p. 143, § 10.08; Ex. C, p. 125, § 10.08.

"The purpose of no-action clauses like § [10.08] is to protect the securitizations--and in turn other certificateholders--from the expense of litigating an action brought by a small group of certificateholders that most investors would consider not to be in their collective economic interest." Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., 837 F.Supp2d 162, 184 (S.D.N.Y. 2011). No action clauses are to be strictly construed. Id. This strict construction notwithstanding, the court in Ellington held that a similar no action clause did not apply to investors in mortgage-backed securities insofar as the investors were suing the trustee because it would be "absurd" to require an investor to ask a trustee to sue itself.[8] Id. at 186. I find the court's holding and rationale persuasive, and I adopt it here. Wells Fargo's Motion is denied insofar as it seeks dismissal of the breach of contract claim based on the no action clause.

### C. Breach of Fiduciary Duty

In order to establish a breach of fiduciary duty under Colorado law, a plaintiff must prove that the defendant was acting as a fiduciary; the defendant breached a fiduciary duty to the plaintiff; the plaintiff suffered damages; and the defendant's breach of fiduciary duty was a cause of the plaintiff's damages. CJI-Civ.2d 26:1 (2012).

In its Complaint, Galena alleges that Wells Fargo, as trustee of the 2002-2 and 2003-R1 Securities, owes a fiduciary duty to the certificateholders of the trusts, including duties of loyalty; to avoid conflicts of interest; of impartiality among trust beneficiaries; of care; to prevent the loss of trust assets; and of full disclosure. *Complaint*, ¶ 96. Galena further alleges that Wells Fargo breached its fiduciary duties to Galena when it "labored under a conflict of interest and . . . failed to assume or compensate Plaintiff for WaMu's servicing-related liability,

---

[8]Wells Fargo does not address this holding although Galena raised it in its Response.

21

permitted itself to act as servicer despite its contractual ineligibility, passed losses for improper

servicing advances and reimbursements on to the trusts, failed to prevent WaMu from

improperly reimbursing itself for servicing advances and passing the associated losses on to the

trusts, failed to disclose to plaintiff that it had or should have had access to documentation

necessary to investigate WaMu's improper servicing activities, failed to pursue remedies on

behalf of Plaintiff or otherwise aid Plaintiff in its effort to pursue remedies, and lost or destroyed

documentation likely to contain evidence of WaMu's and/or its own servicing-related liability."

Id. at ¶ 97.

Wells Fargo argues that section 8.01 of the Pooling and Servicing Agreements limit its

liability as a trustee.  *Brief*, p. 8.  Section 8.01 provides in pertinent part:

> No provision of this Agreement shall be construed to relieve the
> Trustee from liability for its own negligent action, its own
> negligent failure to act or its own willful misconduct; provided,
> however, that:
>
> Unless an Event of Default, Chase Event of Default or WaMu
> Event of Default known to the Trustee shall have occurred and be
> continuing, the duties and obligations of the Trustee shall be
> determined solely by the express provisions of this Agreement and
> the related Servicing Agreement, the Trustee shall not be liable
> except for the performance of such duties and obligations as are
> specifically set forth in each Servicing Agreement, no implied
> covenants or obligations shall be read into each Servicing
> Agreement against the Trustee and the Trustee may conclusively
> rely, as to the truth of the statements and the correctness of the
> opinions expressed therein, upon any certificates or opinions
> furnished to the Trustee and conforming to the requirements of
> each Servicing Agreement which it believed in good faith to be
> genuine and to have been duly executed by the proper authorities
> respecting any matters arising hereunder . . . .

*Brief*, Exs. B and C, § 801(I).

Colorado courts recognize the Restatement (Second) of Torts' definition of breach of fiduciary duty, Moses v. Diocese of Colorado, 863 P.2d 310, 321 (Colo. 1993), which states that "[o]ne standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation."  Restatement (Second) of Torts § 874 (1979).  "A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation."  Id. at Comment a.

The parties do not cite any Colorado law regarding whether a securitization trustee owes fiduciary duties to the certificateholders, and my research has not revealed any Colorado law on point.  In the absence of such authority, I find persuasive the reasoning and holding of the New York court in Ellington, 837 F.Supp2d at 184.  There, the court recognized that much of the common law of trusts, with its corresponding fiduciary obligations, is not applicable to commercial trusts like those at issue in this case.  Id. at 191.  To the contrary, the duties "are generally strictly defined and limited to the terms" of the governing contracts.  Id. (internal quotations and citations omitted).

Prior to the event of a default, however, two exceptions to this rule exist: a trustee has extra-contractual common law duties to "(1) avoid conflicts of interest, and (2) perform all basic, non-discretionary, ministerial tasks with due care.[9]  Id. at 191-92.  See also Sterling Federal

---

[9]The Ellington court also stated that these limited extra-contractual duties expand after the occurrence of an event of default.  Id. at 191.  This is because "it is usually only the trustee who is able to act swiftly and effectively to assure" that the rights of the certificateholders "to recover what they are owed will ultimately be vindicated."  Beck v. Manufacturers Hanover Turst Co., 218 A.D.2d 1, 12 (N.Y.A.D. 1995).  As set forth above in section 10.08 of the Pooling and Service Agreements, certificateholders must provide to the trustee a written notice of a default; a written request to institute an action from certificateholders evidencing not less than

Bank, F.S.B. v. DLJ Mortgage Capital, Inc., 2010 WL 3324705 at *7 (N.D.Ill. August 20, 2010).

"These two pre-default obligations are not construed as '*fiduciary* duties,' but as obligations

whose breach may subject the trustee to 'tort liability.'" Id. at 192 (emphasis in original) (citing

AG Capital Funding Partners, L.P. v. State Street Bank and Trust Co., 11 N.Y.3d 146, 157, 896

N.E.2d 61, 67, 866 N.Y.S.2d 578, 584 (N.Y. 2008)).

      These extra-contractual duties are imposed because "the duty of a trustee, not to profit at

the possible expense of his beneficiary, is the most fundamental of the duties which he accepts

when he becomes a trustee," and "so far as a corporation sees fit to assume the duties" of a

trustee, it cannot "shake [them] off" through "instruments . . . overladen with exculpatory

provisions effectively insulating" the trustees from "legal accountability for what would

reasonably be viewed as serious lapses in their performance." Beck v. Manufacturers Hanover

Trust Co., 218 A.D.2d 1, 11-12, 632 N.Y.S.2d 520, 526-27 (N.Y.A.D. 1 Dept. 1995).

      The Ellington court relied on case law applicable to bond indentures, stating that

"[c]onsistent with other courts that have addressed this issue, the Court here finds that these

constraints apply with similar force to securitization trustees subject to [Pooling and Service

Agreements], which are trust agreements similar to bond indentures in many respects."

Ellington, 837 F.Supp.2d at 192. The Colorado Court of Appeals has recognized that, unlike an

ordinary trustee, an indenture trustee's duties and obligations are defined by the terms of the

---

25% of the voting rights; and reasonable indemnity. *Brief*, Exs. B and C, § 10.08. The
Complaint does not allege that Galena met these requirements. To the contrary, the Complaint
alleges only that Galena's limited partner informed Wells Fargo of its belief that WaMu had
violated the Servicing Agreements and that Galena had suffered damages as a result. Therefore,
Galena's claim for breach of fiduciary duty cannot be based on Wells Fargo's post-default
duties.

indenture agreement.  <u>Central Bank of Denver, N.A. v. Deloitte & Touche</u>, 928 P.2d 754, 755 (Colo.App. 1996).  In doing so, the court cited <u>Lorenz v. CSX Corp.</u>, 1 F.3d 1406 (3rd Cir.1993) for its holding that the "duties of indenture trustee [are] defined exclusively by terms of indenture, except that trustee must avoid conflicts of interest."  <u>Id.</u>

Galena has sufficiently alleged that Wells Fargo labored under a conflict of interest when it purchased WaMu's servicing portfolio and then functioned as both trustee for the trusts and servicer for many of the loans in the trusts.  Therefore, Galena has sufficiently stated a claim upon which relief can be granted.[10]

Wells Fargo argues that there was no conflict of interest because section 7.08 of the Pooling and Service Agreements expressly permits Wells Fargo to serve as a successor servicer to WaMu.  *Wells Fargo's Reply Brief in Support of its Motion to Dismiss* [Doc. #38] (the "Reply"), p. 5.  However, there are no allegations in the record that Wells Fargo succeeded WaMu as servicer under the conditions outlined in that provision.

Wells Fargo also argues that Galena's claim for breach of fiduciary duty is barred by the economic loss doctrine.  *Brief*, p. 10.  The economic loss rule provides:

> [A] party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law. Economic loss is defined generally as damages other than physical harm to persons or property.

<u>Town of Alma v. Azco Construction, Inc.</u>, 10 P.3d 1256, 1264 (Colo. 2000).

---

[10]Galena does not argue that Wells Fargo breached an extra-contractual duty to perform all basic, non discretionary, ministerial tasks with due care; it argues only that Wells Fargo breached a duty to act free of conflicts of interest.  *Response*, pp. 7-10.

The parties have not adequately raised or briefed the issue of which state's law governs the economic loss doctrine.  Nevertheless, under both Colorado and New York law, the economic loss doctrine does not bar a claim in tort if there exist duties independent of the contract.  Id.; Avazpour Networking Services, Inc. v. Falconstor Software, Inc., 2013 WL 1386264 (April 3, 2013 E.D.N.Y.).

As discussed above, Galena has sufficiently alleged that Wells Fargo in its capacity as trustee breached its extra-contractual duty to avoid conflicts of interest.  Therefore, Galena's claim for breach of this duty is not barred by the economic loss doctrine.

### D.  Breach of the Implied Duty of Good Faith and Fair Dealing

"A covenant of good faith and fair dealing is implied in all contracts, encompassing any promises which a reasonable person in the position of the promisee would be justified in understanding were included and which are not inconsistent with the terms of the contract." Turkat v. Lalezarian Developers, Inc., 52 A.D.3d 595, 596, 860 N.Y.S.2d 153, 154 (N.Y.A.D. 2 Dept. 2008) (citing Dalton v. Educational Testing Service, 663 N.E.2d 289, 291, 87 N.Y.2d 384, 389 (N.Y. 1995)).

Galena alleges that Wells Fargo, as trustee and servicer, breached the implied duty of good faith and fair dealing when it "deprived Plaintiff of the benefits to which it was entitled under the governing agreements, including the [Pooling and Servicing Agreements] and the Servicing Agreement, as set forth more fully above."  *Complaint*, ¶ 110.

Wells Fargo argues that Galena's breach of good faith claim must be dismissed because it is duplicative of the breach of contract claim.  *Brief*, pp. 14-15.  Specifically, Wells Fargo argues

that because the damages sought for both claims is identical, New York law prohibits the claim for breach of implied duty of good faith and fair dealing.  Id. at p. 15.

However, a plaintiff may assert both a claim for breach of contract and a claim for breach of the covenant of good faith and fair dealing where the plaintiff alleges that the defendant has engaged in conduct that may not technically constitute a breach of contract but nevertheless injures or frustrates the plaintiff's right to receive the benefits of the contractual bargain. Frydman v. Credit Suisse First Boston Corp., 272 A.D.2d 236, 238, 708 N.Y.S.2d 77, 80 (N.Y.A.D. 1 Dept. 2000) (citing A.H.A. Gen. Constr., Inc. v. New York City Hous. Auth., 92 N.Y.2d 20, 31, 699 N.E.2d 368, 677 N.Y.S.2d 9,(N.Y. 1998)); Konecranes, Inc. V. Cranetech, Inc., No. 03-CV-6082T, 2005 WL 246916 at 3 (W.D.N.Y. 2005).  At this stage of the pleading, it is unclear whether the breach of contract claim and the breach of good faith claim are duplicative.  Therefore, I will allow both claims to proceed.  See Sims v. First Consumers National Bank, 303 A.D.2d 288, 290, 758 N.Y.S.2d 284, 286 (N.Y.A.D. 1 Dept. 2003).

### E.  Negligence

"In order to establish a prima facie case for negligence, a plaintiff must show a legal duty of care on the defendant's part, breach of that duty, injury to the plaintiff, and causation, i.e., that the defendant's breach caused the plaintiff's injury."  HealthONE v. Rodriguez ex rel. Rodriguez, 50 P.3d 879, 888 (Colo. 2002).

Galena's negligence claim alleges that "Wells Fargo and/or its predecessor, WaMu, failed to use the degree of care that a reasonably prudent trustee and/or servicer would use in the same circumstances."  *Complaint*, ¶ 114.

Galena argues that under <u>Ellington</u>, Wells Fargo in its capacity as trustee has an extra-contractual duty to perform all basic, non discretionary, ministerial tasks with due care. *Response*, pp. 13-14. However, Galena does not--in the Complaint or its Response--identify the acts or omissions by Wells Fargo underlying its negligence claim. Galena has failed to state a plausible claim for negligence against Wells Fargo in its capacity as trustee.

Wells Fargo's motion to dismiss does not seek dismissal of the negligence claim brought against it as a servicer. Wells Fargo addresses this claim for the first time in its reply in support of its motion. I will not address a motion to dismiss a claim asserted for the first time in a reply brief. The Motion is denied insofar as it seeks dismissal of the negligence claim against Wells Fargo as a servicer.

### F.   Unjust Enrichment

The elements of a claim for unjust enrichment are "(1) at plaintiff's expense, (2) defendant received a benefit (3) under circumstances that it would make it unjust for defendant to retain the benefit without paying." <u>DCB Const. Co., Inc. v. Central City Development Co.</u>, 965 P.2d 115, 119-20 (Colo. 1998). "Unjust enrichment does not depend on the existence of an express or implied-in-fact contract." <u>Interbank Investments, LLC v. Eagle River Water and Staitatino Dist.</u>, 77 P.3d 814, 816 (Colo.App. 2003) (citing <u>Cablevision of Breckenridge, Inc. v. Tannhauser Condo. Ass'n</u>, 649 P.2d 1093 (Colo.1982)). "Instead, courts may imply a contract in law, often termed a quasi-contract, and allow recovery to serve the law of natural immutable justice and equity." <u>Id.</u> (internal quotations and citations omitted) (citing <u>DCB Const. Co.</u>, 965 P.2d at 119). "In general, a party cannot recover for unjust enrichment by asserting a

quasi-contract when an express contract covers the same subject matter because the express contract precludes any implied-in-law contract." Id.

Galena alleges that "Wells Fargo was enriched by its own and WaMu [sic] reimbursement of improperly advanced monies"; "Wells Fargo was enriched at Plaintiff's expense"; and "[e]quity and good conscience militate against permitting Wells Fargo to retain what Plaintiff is seeking to recover." *Complaint*, ¶¶ 118-120.

Wells Fargo summarily argues that "[t]he subject matter of this claim--the advancement and then recoupment of money by a servicer--is encompassed by the various valid contracts among the parties involved in the mortgage-backed securities at issue." *Brief*, p. 17. Wells Fargo does not cite any particular contract or contract provision in support of this statement.

At this point in the litigation, it is unclear whether the subject matter of Galena's unjust enrichment claim is covered by an express contract. Accordingly, I decline to dismiss Galena's claim for unjust enrichment.

## IV.   CONCLUSION

IT IS ORDERED that the Motion to Dismiss [Doc. #16] is GRANTED insofar as it seeks dismissal of the negligence claim against Wells Fargo in its capacity as trustee and DENIED in all other respects.

Dated May 15, 2013.

BY THE COURT:

 s/ Boyd N. Boland
United States Magistrate Judge